## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## AT KANSAS CITY

Medbor Chavez, on behalf of himself
and all others similarly situated,

        Plaintiffs,

  vs.

(1) FBL Financial Group, Inc.;
(2) Farm Bureau Financial Services;
(3) Farm Bureau Property & Casualty Ins. Co.;
(4) Farm Bureau Life Insurance;
(5) FBL Marketing Services, LLC; and
(6) Western Agricultural Insurance Company,

        Defendants.

Case No. 17-2340

## **CLASS ACTION COMPLAINT**

Plaintiff for his Class Action Complaint against Defendants states the following:

1.     This is a lawsuit to hold the Farm Bureau insurance entities (and their executives) accountable for defrauding their "exclusive" and "captive" Insurance Agents.

2.     Farm Bureau treats its Insurance Agents as employees by controlling them and making them financially dependent on Farm Bureau, but then avoids the obligation to pay them the same benefits and on the same terms as properly classified employees. Farm Bureau does so only by fraudulently classifying and treating them as independent contractors.

3.     Farm Bureau portrays itself as a major life and property/casualty insurance company, which has won repeated awards and is a legitimate, reliable company that is publicly traded on the NYSE. But the various Farm Bureau entities are operating as a racketeering enterprise engaged in a scheme to defraud. To help execute this scheme, Farm Bureau exploits its

agency managers (which it also classifies as independent contractors) to use their positions of trust in the communities where they live to solicit and ensnare new Insurance Agents in the Farm Bureau enterprise. Without the perpetual growth of new Insurance Agents into the Farm Bureau enterprise, the enterprise would fall apart. The perpetual treadmill of agency growth and expansion is essential to the ongoing success—and fraud perpetrated by—the Farm Bureau enterprise.

4.     To compete in the increasingly competitive world of insurance sales, Farm Bureau relies on an army of nearly 2,000 Insurance Agents to sell its insurance policies throughout 14 states.

5.     In 2003, Farm Bureau Mutual Insurance Company (Iowa) merged with and effectively acquired Farm Bureau Mutual Insurance Company of Kansas and of Nebraska. As a result of that merger, the Farm Bureau insurance culture began to change. In Kansas and the other states outside of Iowa, Farm Bureau had traditionally been a pleasant insurance company, but with the 2003 merger and consolidation of all operations to Iowa, it became increasingly less so.

6.     In the 2000s, Farm Bureau Mutual Insurance Company (Iowa) began a corporate transformation to camouflage its corporate structure. In a District of Kansas case, the Court in 2008 observed the "confusion" caused by Farm Bureau's corporate structure, which Farm Bureau itself referred to as an "intricately structured fashion."[1]

7.     Today, Farm Bureau continues its confusing corporate structure of entities, and further discovery is needed to reveal that structure.

8.     In any event, Farm Bureau generally operates two lines of insurance sales: it sells (1) life insurance and annuities; and (2) property and casualty insurance. Here is how Farm Bureau

---

[1] *Baxter v. Farm Bureau Mutual Ins. Co., Inc.*, 5:06-cv-04038-RDR, D. Kan., March 4, 2008 (Doc. 89 – Memorandum and Order).

depicts itself on its website (which, unfortunately, is blurry) as of June 2017:



9.      Despite earning over $1B in annual revenue on the backs of its Insurance Agents in the field, Farm Bureau refuses to treat the majority of its workforce as employees. Instead, it improperly labels all of its Insurance Agents as "independent contractors" while treating them like employees. Farm Bureau forces all of its Insurance Agents into an exclusive employment relationship where the agents must sell only Farm Bureau products, obey an extensive set of company rules and regulations, and leave all clients with Farm Bureau when the employment relationship ends—all of which Farm Bureau unilaterally dictates in its own discretion.

10.      Every Farm Bureau agent must sign an "Agreement" (a contract of adhesion) that contains illusory language suggesting the "intent" of the parties is to have the agent be an independent contractor, but Farm Bureau intentionally loads up the Agreement with numerous one-sided terms that contradict this supposed intent. The Agreement also includes a paragraph entitled, "Reserved Right," that allows Farm Bureau to unilaterally modify essentially all aspects

of the Agreement, leaving each Insurance Agent no opportunity to refuse those modifications or any basis to make any modifications of her own.

11.     Although Farm Bureau's Insurance Agents bring in all the business and generate all the revenue, it is Farm Bureau's executive officers alone who reward themselves with top-tier employee benefits packages. Indeed, while Farm Bureau's Insurance Agents cannot participate in the company's retirement plan, its highly-paid executives provide themselves with two different retirement plans and typically participate in both.

12.     By misclassifying its Insurance Agents as independent contractors on paper, while actually controlling them as employees, Farm Bureau has been able to conceal the actual employment relationship it has with its agents and thereby unlawfully deny its Insurance Agents access to the employee protections, rights, and benefit plans they are legally entitled to receive.

13.     Farm Bureau is also willfully committing systematic tax fraud by failing to properly pay state employment taxes owed by falsely classifying all of its Insurance Agents as independent contractors. It thereby deprives the fourteen states it does business in of vital revenue.

14.     The Department of Labor and several courts have recently shined a light on the misclassification of employees as independent contractors. As a result, when deciding if a person is an employee or an independent contractor, courts have increasingly looked beyond labels and titles and focused instead on two objective factors that cannot be manipulated: the actual degree of control and economic dependence. Farm Bureau flunks both factors by wide margins.

15.     To reel in new Agents, Farm Bureau promises prospective Insurance Agents independence and the opportunity to run their own business with freedom in conducting the means and manner of operations. Farm Bureau even promises in the Agreement that each Insurance Agent will have "control over the manner or means by which [the Agent] will conduct his business." But

4

the cold reality is that Farm Bureau does the opposite by exercising extensive control over the terms, manner, and means of the insurance agents' jobs such that they are effectively "employees."

16.     It is only after the Agents sign the Agreement and become financially dependent upon Farm Bureau for economic survival that they learn of Farm Bureau's lengthy lists of rules and requirements (none of which is listed in the Agreement) that all agents must follow or face termination.

17.     Once the Insurance Agent realize the true nature of the employment relationship, they face a lose-lose-lose dilemma: (a) stay trapped under the thumb of Farm Bureau and be treated like an employee without any employee rights or benefits; (b) face termination by Farm Bureau, which could strike at any point, and then start over, as Farm Bureau prohibits its agents from contacting any clients obtained during the time with Farm Bureau; or (c) quit and start over, as Farm Bureau prohibits its agents from contacting any clients obtained during the time with Farm Bureau.

18.     By misclassifying its Insurance Agents as "independent contractors," rather than employees, Farm Bureau has not only unjustly enriched itself (by avoiding the business costs of extending employee benefits to its Insurance Agents), but it has also evaded and continues to evade compliance with state and federal laws governing employee benefits, rights, and protections.

19.     Farm Bureau's use of the Agreement is a scheme to defraud its agents, and by enlisting its independent contractor agency managers to recruit, solicit, hire, and defraud new agents by having them sign the Agreement, the Farm Bureau Agent Enterprise conducts and participates in a pattern of racketeering activity involving mail fraud and wire fraud.

20.     Plaintiffs bring this lawsuit to stop to the systematic fraud perpetuated by Farm Bureau and its executives, who continue to prey on unsuspecting "agents" by promising them a

rewarding and independent insurance career but have no intention of delivering on that promise.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. § 1964(c), 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 1367. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) as the amount in controversy exceeds $5,000,0000, exclusive of interest and costs, and at least one member of the class is a citizen of a state different from the Defendants.

22.     This Court is a proper venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this complaint occurred in this judicial district.  This Court is also a proper venue under 29 U.S.C. § 1332(e)(2) because Plaintiffs were employed by Farm Bureau, misclassified as "independent contractors" instead of "employees," and denied ERISA benefits in this judicial district.

## PARTIES

23.     Plaintiff Medbor Chavez was, during the relevant period, an Agent for Farm Bureau and resides in Kansas City, Kansas.

24.     Mr. Chavez was also employed as an Agent for several years before resigning in 2016.

25.     Defendant FBL Financial Group, Inc. ("FBLFG") is an Iowa corporation with its principal place of business at 5400 University Ave., West Des Moines, Iowa 50266.  FBLFG serves as a holding company and administrator for a network of Farm Bureau subsidiaries throughout the nation.

26.     Defendant Farm Bureau Financial Services ("FBFS") is an Iowa corporation with its principal place of business at 5400 University Ave., West Des Moines, Iowa 50266.  FBFS

provides a common logo and serves as a connecting entity for all Farm Bureau affiliates and a network of insurance agents.

27.     Defendant Farm Bureau Property & Casualty Insurance Company ("FBPCIC") is an Iowa corporation with its principal place of business at 5400 University Ave., West Des Moines, Iowa 50266. FBPCIC serves as the core Farm Bureau entity for automotive and property insurance. Notably, FBL states on its website that FBPCIC is "[m]anaged by FBL Financial Group" but that its "[u]nderwriting results do not impact FBL Financial Group's results."

28.     Defendant Western Agricultural Insurance Company ("WAIC") is a sister corporation to FBPCIC that sells the same type of insurance by simply operates in a smaller geographic market.

29.     Defendant Farm Bureau Life Insurance ("FBLI") is an Iowa corporation that serves as the main operating subsidiary of FBLFG and provides life insurance policies and related products.   FBLI sells life insurance and related products through a distribution channel of approximately 2,000 exclusive Farm Bureau agents. FBLI purports to not have any employees.

30.     Defendant FBL Marketing Services, LLC ("FBLMS") is an Iowa corporation that provides mutual funds and variable products.

31.     Defendants FBLFG, FBFS, FBPCIC, WAIC, FBLI, and FBLMS are collectively referred to as the "Farm Bureau Enterprise" or "Farm Bureau" or "Defendants" throughout this Complaint, unless specifically referred to by name.

32.     "Farm Bureau," as used throughout this Complaint, is specifically defined to include all successor, predecessor, subsidiary, and related entities to which these allegations pertain. In a different depiction, here is how Farm Bureau depicts its corporate structure:



33.     As shown by Farm Bureau's own depiction, Farm Bureau's life insurance entities are distinct.  Farm Bureau is loosely affiliated with the property-casualty insurance companies. The dotted line drawn between FBLFG and the "Property-Casualty Companies Under FBL Management" shows a contractual management agreement where FBLFG manages the property-casualty companies, but they are not vertically integrated as one company. Nor are the Farm Bureau property-casualty insurance companies held as subsidiaries of FBLFG.

34.     At all relevant times, the Farm Bureau entities were engaged in the business of selling insurance throughout the United States, including in Kansas.

## FACTS

35.     Defendants employ roughly 2,000 Insurance Agents to exclusively sell Farm Bureau insurance products.

36.     Each Farm Bureau agent must sign an Agent Agreement (the "Agreement") as a mandatory condition of employment.

37.     The terms of the Agreement between each member of the Class and Farm Bureau are the same in all material respects, and the Agreements for Plaintiffs are representative of the

8

Agreements between Farm Bureau and each member of the Class.

38.     The Agreement is, and at all relevant times has been, a contract of adhesion, drafted exclusively by Defendants—who give the agents no opportunity to negotiate or change any terms and who require the agents to sign the Agreement as presented by Defendants as a condition of employment.

39.     Thus, while the Agreement states that the Agents are "Independent Contractors," that is a hollow label that is rendered meaningless when the Agents later learn that Farm Bureau actually in fact imposes hundreds of restrictions and rules that control the method and manner of all Insurance Agents' business operations.

**A.     Farm Bureau Controls All Meaningful Aspects of the Work Relationship and Treats Its Agents as "Employees"**

40.     Defendant Farm Bureau and its affiliate network lure Insurance Agents into their operations with promises of independence and self-employment, but after Agents sign the Agreement, Defendants force the Agents to obey a morass of rules that control all material aspects of the Agents' business operations.

41.     Agents are labeled as "independent contractors" in the Agreement, but Farm Bureau fails to disclose its extensive collection of written and unwritten policies and procedures that Insurance Agents are required to comply with as a condition of their continued employment.

42.     These policies and procedures provide Farm Bureau with almost total control over the Insurance Agents' business operations.

43.     When Insurance Agents do not follow a Farm Bureau policy or procedure, whether disclosed or undisclosed, known or unknown, Insurance Agents are subject to discipline by Farm Bureau, including termination.

44.     Indeed, Farm Bureau regularly resorts to these written and unwritten policies to avoid paying future commissions due to Insurance Agents after they sign up enough of a profitable collection of customers under Farm Bureau insurance policies.

45.     The Insurance Agents are economically dependent on Farm Bureau for wages, continued employment, advertising materials, required computer equipment and software to access approved insurance brokerages when providing quotes, and obtaining training to comply with the company's extensive rules and regulations.

46.     The following items demonstrate Farm Bureau's excessive control over the employment relationship such that the Agents are "employees" based on the repeated conduct at issue:

    a.  **Where Agents Work**

        i.   Agents can only work at office locations approved by Farm Bureau.

        ii.  Farm Bureau forbids agents from working out of a home office at the Agent's residence.

        iii. Agents can only maintain an office where Farm Bureau's logos are exclusively displayed. If other businesses operate in the same commercial office building as an Agent, Farm Bureau inspects the building and requires Agents to re-locate if other business logos are on display.

        iv.  Agents must also display a specific number of various sizes of Farm Bureau logos at specific locations in any office.

        v.   Agents cannot make additional display materials without Farm Bureau's prior approval. Agents cannot display anything specific to

the Agents themselves instead of Farm Bureau.

vi.    Due to Farm Bureau demanding office and display requirements, most Agents are forced to lease office space in one of the many buildings owned and operated by Farm Bureau, which further unjustly enriches Farm Bureau to the detriment of its Agents.

vii.    By forcing its Agents to locate their offices in Farm Bureau's buildings, Farm Bureau is able to monitor Agent's business operations more closely and ensure that Agents comply with all of Farm Bureau's business operation requirements.

b.  **What Agents Sell**

i.    Farm Bureau requires that Insurance Agents exclusively represent Farm Bureau and only sell Farm Bureau products.

ii.    Agents cannot sell insurance for any other insurance company, even if Farm Bureau does not sell the type of insurance coverage at issue.

iii.    Agents can only obtain quotes and sell coverage from brokers approved by Farm Bureau, even if an Agent could get lower premiums for a client by using a different brokerage.

c.  **Who Agents Hire**

i.    Agents cannot hire any staff member without Farm Bureau's prior approval.

ii.    Farm Bureau runs background checks on all proposed hires, and Agents must abide by Farm Bureau's hiring decision.

iii.    Any staff members approved for hire must also comply with an

11

extensive set of Farm Bureau rules.

 iv. Even if an Agent is allowed to hire a staff member, Farm Bureau also retains the authority to fire an Agent's office staff.

 d. **How Agents Advertise**

  i. Farm Bureau regularly creates the advertising materials that all Agents must display and use.

  ii. Agents can only buy business cards through Farm Bureau. Agents cannot alter the design or content of Farm Bureau's business cards.

  iii. Agents cannot host or create a business website. Farm Bureau creates an online profile on the company website for all Agents. Agents who leave Farm Bureau lose access to this web profile.

  iv. Agents must provide Farm Bureau's required disclosures on all business materials provided to the public.

  v. Farm Bureau regularly rejects Agents' requests to advertise with different materials or through public mediums. For example, several Spanish-speaking Agents could only host a radio show or run TV ads using a word-for-word script provided and enforced by Farm Bureau.

  vi. Failure to comply with Farm Bureau's advertising policies results in discipline by Farm Bureau's home office and can result in termination.

 e. **What Agents Use to Perform Work**

  i. Agents must use Farm Bureau's software and database systems for all business operations.

  ii. All email communications, price estimates, and insurance sales rely on

Farm Bureau's exclusive software system. Agents lose all access to this system, business emails, client information, and business documents the moment an Agent is terminated by Farm Bureau.

iii.    Farm Bureau has IT professionals that Agents must contact to resolve any technology or system-related issues.

iv.    Farm Bureau disciplines agents for conducting any business activities through any medium other than Farm Bureau's portal system.

v.    Agents and all other properly classified "employees" use the same software and portal system, have the same domain attached to their business email addresses, receive the same training on using Farm Bureau systems, must comply with the same access and conduct rules when using the system, and are subject to the same regular supervision and potential discipline for violating system rules by Farm Bureau.

f.    **Ownership of Agents' Book of Business**.

i.    Insurance Agents do not own their books of business and, upon leaving Farm Bureau, Agents cannot contact any of their former Farm Bureau clients to offer insurance coverage through a different entity.

ii.    Agents are subject to an express non-compete clause that precludes any Agent from trying to solicit any of its current customers, no matter how long the Agent has provided services to such customers.

iii.    Agents must solicit a certain amount of insurance business in their assigned regions to be eligible for a salary. Failure to meet the regional goal more than once often results in termination by Farm Bureau and

13

a prohibition from contacting clients to entice them to leave Farm Bureau.

iv.   Even while still employed under the contract, Agents cannot control which clients remain assigned to them. Even if an Agent signs up a new client, Farm Bureau has full control and power to assign that client to a different agent.

v.   Farm Bureau retains the right to change Agents' compensation without prior notice or consent. Agents are subject to all compensation decisions made by Farm Bureau.

g.   **Regular Audits to Force Compliance with Business Procedures**

i.   Farm Bureau promises in its Agent Agreements to let Agents "control the mode of doing business." The Agreement then states that Farm Bureau may impose "rules and regulations," yet none of these rules are identified or disclosed in the Agreement.  In fact, it is only after Agents sign the Agreement that they learn of Farm Bureau's voluminous collection of business rules and restrictions controlling how Agents operate their business.

ii.   Farm Bureau also sends Agency Managers to perform quarterly audits and to document and enforce full compliance with all of Farm Bureau's rules and restrictions.

iii.   Farm Bureau uses an audit checklist that details 59 independent requirements that Agents must follow in all business activities.

iv.   Agency Managers must verify each Agent's compliance with all 59

14

audit items.

v.   Several of these 59 audit items reference additional company policies that provide additional sets of rules.

vi.   For example, one of the audit items references "required retention" of Client Files.  The specific requirements for retaining Client Files are found in a separate document that lists 48 rules and processes that Farm Bureau Agents must follow with regarding to retaining collections of Client Files, such as what documents must be included in the files, how to maintain those files, and different storage methods that Agents must follow during the 10-years retention period.  Failure to comply with any one of the 48 additional Client File rules would result in failing to meet the single item listed on the audit checklist.

vii.   Agency Managers also regularly submit instruction memos to Agents before an audit that include additional requirements and items that Agents must produce for the audit.

viii.   Ultimately, failure to prove compliance with any of the hundreds of regulations and restrictions promulgated by Farm Bureau is construed by Farm Bureau as a basis to impose discipline or even terminate an Agent.

h.  **Required Training and Meetings**

i.   Farm Bureau requires its Managers to maintain a training-program attendance record for all Agents. Farm Bureau tells Agents that the meetings are optional, but Managers regularly review the attendance

record with Agents and often threaten termination for those Agents who do not attend unless their attendance improves.

ii.   Farm Bureau also requires all Agents to attend two meetings per week with the Regional Manager. The Managers set the date and time for these meetings, and Agents must reschedule any conflicting appointments.

iii.   Farm Bureau requires Agents to get certain types of Insurance Licenses. After obtaining each license, Agents must then undergo mandatory internal training to learn Farm Bureau's specific requirements for using that particular license to sell insurance.

iv.   Farm Bureau requires all Insurance Agents and their staff to complete online training modules, and compliance is documented in the Manager's quarterly audit.

### i.   Control Over What Agents Say

i.   All Agents must disclose any social media accounts. The Agency Manager "must routinely monitor" the Agents' accounts and report any items of interest to Farm Bureau.

ii.   Managers have full authority—which they exercise during regular audits—to comb through Agents' emails, call history, and computer files to see if Agents are complying with all of Farm Bureau's rules and restrictions regarding communications, client contact, or doing business with another entity without telling Farm Bureau.

iii.   Even when unrelated to the business relationship with Farm Bureau,

Agents must provide notice of any litigation, incidental client contact, or business relationship with any other entity.

iv.     Agents and Internal Employees alike are subject to Farm Bureau's Required Code of Conduct and Code of Ethics. Farm Bureau retains the right to terminate Insurance Agents or the Insurance Agents' staff for violations of the Code of Conduct.  Farm Bureau can amend The Code of Conduct at any time by Farm Bureau without consent.

47.     At all times relevant, Farm Bureau asserted control and dominion over virtually all aspects of Plaintiffs' and the Class members' businesses.

48.     At all times relevant, Farm Bureau and its Agents enjoyed a continuing employment relationship unlimited in time period where both Farm Bureau and its Agents had the right to terminate the employment relationship.

49.     At all times relevant, Farm Bureau Insurance Agents were integrated into Farm Bureau's business of selling insurance.

50.     Nonetheless, Defendants misclassified and continue to misclassify Agent-employees as independent contractors.

51.     As a result of Farm Bureau's misclassification of all Insurance Agents as independent contractors, Plaintiffs and the Class members were deprived of the rights and protections guaranteed by state and federal law to employees.

52.     Farm Bureau also hires "agency managers" or "market managers" to recruit and solicit new Insurance Agents.

53.     These independent contractors receive "overrides" (a commission based on an underlying sales commission) for each insurance sale made by the Insurance Agents they bring

17

into the Farm Bureau enterprise. Thus, the more Insurance Agents recruited into the Farm Bureau enterprise, the more the agency manager and Farm Bureau make in revenue and overrides.

54.     The override paid to the agency manager or market manager is a form of sharing profits between Farm Bureau and the agency manager or market manager, who is an independent contractor.

55.     Farm Bureau, however, considers the agency managers and market managers to be independent contractors, not employees.

**B.     Burden without a Benefit—Farm Bureau's Agents are Unlawfully Excluded from Farm Bureau's Employee Benefit Plans**

56.     To properly classified employees, Defendants also provide benefit plans that are and were unavailable to Plaintiffs and Class Members due to the misclassification as "independent contractors."

57.     If Plaintiffs and Class Members had been properly recognized as employees during their terms of service, they would have received superior insurance, retirement, disability, and other employee benefits from Defendants.

58.     Farm Bureau has for decades maintained that its Insurance Agents, including Plaintiffs and Class Members, are independent contractors—even when agents challenged that designation.

59.     As a result, to the extent any administrative remedies were available, it would have been futile for Plaintiffs and Class Members to pursue them.

## CLASS ALLEGATIONS

60.     Plaintiff brings this action as an individual case and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure. The Class is defined as "all

18

signatories to the Farm Bureau Agent Agreements as 'the Agent' or 'Registered Representative' during the Class Period," as further defined and limited below (the "Class").

61.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling and accrual issues, and ending on the date of entry of judgment.

62.     Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed by amendment or amended complaint. Specifically excluded from the Class are Defendants and their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint-venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them, the Judge assigned to this action, and any member of the Judge's immediate family.

63.     *Numerosity***.** The Class is so numerous that joinder of all members in this action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains thousands of similarly situated current and former Farm Bureau Insurance Agents scattered throughout multiple states. Upon information and belief, these Agents were parties to substantially similar, if not identical, Farm Bureau Agency Agreements and were also subject to the same common scheme depriving them of employee benefits.

64.     *Existence and Predominance of Common Questions of Law and Fact***.** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. These common legal and factual questions, each of which yield a common answer, include, but are not limited to, the following:

19

a. Whether Plaintiff and the Class Members have the requisite independence and discretion of independent contractors;

b. Whether, based on Defendants' control, conduct, and creation of economic dependence, Plaintiff and the Class Members are employees of Farm Bureau;

c. Whether Plaintiff and the Class are entitled to benefits under Defendants' benefit plans due to the actual status as employees;

d. Whether Defendants misrepresent the extent of control over their Insurance Agents in recruiting materials and Agency Agreements;

e. Whether Plaintiff and the Class are entitled to reimbursement for benefits they should have been receiving as employees during their terms of employment, but which they were improperly denied based on Defendants' misclassification of Class Members and Plaintiffs as independent contractors and not employees;

f. Whether, if Plaintiff and Class Members are "employees," that these employees represent a significant percentage of the total workforce such that Defendants would be required to include them within any employee benefit plan subject to ERISA and offered to all other employees;

g. Whether the actions of Defendants are applicable to the Class as a whole, entitling Class Members to declaratory or injunctive relief;

h. Whether Plaintiff and Class Members are entitled to damages from withheld or denied employee benefits, uncompensated business expenses, and other related financial losses that properly classified employees would not bear;

65. **_Typicality_.** Plaintiff's claims are typical of the claims of the Class members in that Plaintiff and each member of the Class is or has been an "agent" pursuant to a Farm Bureau Agent

20

Agreement, and each has suffered and will continue to suffer financial hardship and other damages as a result of Defendants' misconduct.

66.     ***Adequacy of Representation***. Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class.

67.     ***Superiority***. A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  Given the investments that Class members made to become Farm Bureau Insurance Agents, it would now be virtually impossible for the members of the Class, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class Members could afford such individualized litigation, the court system could not sustain it. Individualized claims brought by members of the Class would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

## COUNT I
## VIOLATION OF THE RACKETEER INFLUENCED
## AND CORRUPT ORGANIZATIONS ACT (RICO)

68.     Plaintiffs restate and re-allege the above paragraphs as if fully set forth in this cause of action.

### The Farm Bureau Enterprise (the "FBE")

69.     Plaintiffs, each member of the Class, and each Defendant are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

70.     For purposes of this claim, the RICO "enterprise" is an association-in-fact enterprise, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c) and Tenth Circuit case law, that consists of the six Defendants:

> (1) FBL Financial Group, Inc.;
> (2) Farm Bureau Financial Services;
> (3) Farm Bureau Property & Casualty Ins. Co.;
> (4) Farm Bureau Life Insurance;
> (5) FBL Marketing Services, LLC; and
> (6) Western Agricultural Insurance Company,

plus the Agency Managers, Market Managers, District Sales Managers that Defendants use to recruit other Farm Bureau Insurance Agents by paying them "overrides" for the sales made by the Insurance Agents they solicit and bring on board to Farm Bureau (collectively, the "Farm Bureau Enterprise" or "FBE").

71.     Defendants intentionally layered the Farm Bureau corporate structure so that their activities are concealed and they cannot be pinpointed for the misconduct they commit. This corporate shell game should not be allowed to be used a shield to protect the fraud committed by Defendants, and certainly not before discovery has occurred.

72.     Not all members of the FBE are named as Defendants. Some members of the FBE

might have been trapped by the Defendants into participating in the recruiting activities designed to further the FBE. Even so, each member of the FBE participated in the affairs of the enterprise and helped to perpetuate and further the reach of its tentacles into the market for insurance agents looking for a rewarding career.

73.     But for the recruiting activities of Farm Bureau's Agency Managers and Market Managers (which it calls independent contractors), the enterprise-in-fact would have crumbled because it would not have obtained new insurance agents, which was vital to expand Farm Bureau's operations and revenues, which allowed it to recruit and solicit even more agents, and on and on.

74.     The FBE is separate and distinct from the persons that constitute the Enterprise.

75.     The companies and individuals in the FBE were associated in fact for the common purpose of enriching themselves at the expense of Plaintiffs and the Class, who were deceived into signing the Agreement to become Farm Bureau Insurance Agents and were forced to work under the thumb of Farm Bureau without being afforded the rights of employees, as described above.

76.     At all relevant times, the FBE was engaged in, and its activities affected, interstate commerce.

77.     The proceeds of the Enterprise were distributed to its participants, including each of the Defendants. The Farm Bureau entities shared the revenues, and the Agency Managers who recruited the new Insurance Agents were paid "overrides" (a form of a commission) directly in proportion to the sales generated by the new Insurance Agents recruited.

78.     The FBE could not have succeeded if Defendants had not coordinated, worked together in shared interdependence, and shared profits. By doing so, Defendants advanced the goals of the enterprise in fact and not simply their own.

23

79.     The FBE was ongoing and worked together toward a common purpose: to lock Insurance Agents into a situation where they were financially dependent upon Farm Bureau but could not modify the conditions imposed by Farm Bureau, and to enrich the members of the FBE at the expense of the Insurance Agents by refusing to provide all the costs of employment.

80.     All of the Defendants and the Agency Mangers in the FBE worked together and cooperatively toward this common purpose.

81.     The FBE has operated from at least 2012 to present.

82.     The FBE has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engage.

**The Pattern of Racketeering Activity**

83.     At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants conducted the affairs of the FBRE through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5), by virtue of the conduct described in this Complaint.

84.     The Defendants have conducted the affairs of the FBE and participated in the operation and management thereof.

85.     The pattern of racketeering activity consists of ongoing mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

86.     Specifically, Defendants engaged in an intentional scheme to defraud the Insurance Agents by having them sign the Agreement through false or fraudulent pretenses, representations, promises, or half-truths.

87.     In particular, every Insurance Agent was required to sign the Agreement, which purported to allow the Insurance Agent significant control over her insurance sales business. In reality, once the Insurance Agent is signed up and dependent on Farm Bureau for a career (each is

24

an exclusive agent), a different reality unfolded for every Insurance Agent. As explained in the allegations above, Farm Bureau exercised excessive control, prevented each Insurance Agent from running her own business, and inflicted the lose-lose-lose dilemma on each Insurance Agent.

88.     Because of the scheme to defraud, each Insurance Agent suffered damage to her property based on the denial of employment rights and benefits, early termination, being forced to quit, and in all circumstances, not earning as much as they would have as employees and not being able to take clients or customers with them once terminated or they had quit.

89.     Each time Farm Bureau induced an Insurance Agent to sign the Agreement, the Defendants committed mail and/or wire fraud.

90.     It was reasonably foreseeable to the Defendants that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme: the U.S. mails or the Internet was used to transmit the Agreement to each Insurance Agent and to Farm Bureau, and the commissions obtained by Farm Bureau from the insurance sales by each Plaintiff and Class Member required use of interstate wires.

91.     Farm Bureau also used the mails or wires to transmit "override" payments to each Agency Manager for the sales made by the Insurance Agents they had successfully trapped into selling insurance products for Farm Bureau as independent contractors, which furthered the pattern of racketeering and ensured that each Agency Manager would continue to recruit, solicit, and sign up more and more Insurance Agents, further perpetuating the scheme to defraud.

92.     Farm Bureau and the Agency Managers also relied extensively on interstate wires to facilitate its recruiting scheme and to recruit and solicit Insurance Agents into its corporate structure.

93.     Thus, the nature and pervasiveness of the FBE necessarily involved frequent wire

and/or mail transmissions.

94.     Rule 9(b) requires that wire and mail fraud be stated with particularity.  Plaintiffs, as class representatives, set forth the following:

95.     Mebdor Chavez became a Farm Bureau Insurance Agent in 2015 in Kansas City, KS. He started as a "reserve agent" but then was transitioned into being an exclusive Farm Bureau Insurance Agent.

96.     He was recruited by an existing Farm Bureau agent.

97.     Mr. Medbor read and was told that he would be independent and have his own business selling Farm Bureau products.  After completing the "reserve" phase and signing the Agreement, however, Farm Bureau sprung a barrage of rules and restrictions on Mr. Chavez.  For example, Farm Bureau wouldn't let him office out of his home, he could only go on the local Spanish radio station and advertise using a word-for-word script from Farm Bureau, he would not and did not receive a commission for writing various insurance policies from several clients he personally found and signed up, he had to get anyone he hired licensed directly with Farm Bureau, along with a variety of other controlling limitations that he learned about after signing up with Farm Bureau to be an exclusive Farm Bureau Insurance Agent.

98.     In 2016, Mr. Chavez quit Farm Bureau because of the excessive control that prevented him from being independent, and he now has his own, truly independent insurance business.

99.     The precise dates of all transmissions cannot be alleged without access to the books and records of the Defendants, but the allegations regarding Plaintiff are indicative of each Class Member because the Agreement signed by Plaintiff and the other Class Members is materially the same.

100.     The scheme to defraud involved a financial transaction based on a written contract (the Agreement) that was materially the same for Plaintiff and all members of the Class.  There are no issues of reliance or any material differences that depend on any oral promises; the Agreement is materially the same for every Insurance Agent.

101.     Defendants each participated in the scheme to defraud knowingly, willfully, and with a specific intent to defraud royalty owners into bearing the full cost of falsely inflated, unauthorized charges in connection with their royalty payments.

102.     The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). The predicate acts were not isolated events, but were related acts aimed at the common purpose and goal of defrauding the Insurance Agents and thereby enabling Defendants to reap illicit profits and save money they should have paid for employment costs.

103.     Defendants were common participants in the predicate acts. Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive the Insurance Agents of Farm Bureau.

104.     These predicate acts are a part of the Defendants' regular way of doing business and will be repeated as to Plaintiff and the Class well into the future.

105.     If any of the Defendants did not conduct or participate in the enterprise, all of the Defendants nevertheless conspired to do so, in violation of § 1962(d).

106.     RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

107.     Each of the Defendants is liable under § 1962(d) for conspiring to assist in the scheme to defraud, set forth in detail above.

**Causation and Injury to Plaintiff and the Class**

108.     As a direct and proximate result of violations of 18 U.S.C. § 1962(c) and (d) by Defendants, Plaintiff and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).

109.     Plaintiffs and the Class are the direct victims of the scheme to defraud, and no other group of plaintiffs or victims is better positioned to bring this suit.  There is a direct line from the fraud committed by Defendants to Plaintiffs.

110.     Plaintiff and the Class had and continue to have money denied to them and clients, customers, and commissions withheld from them by reason, and as a direct, proximate, and foreseeable result, of the scheme to defraud alleged.

111.     Moreover, the false categorization of Plaintiff and the Class as independent contractors was an integral and necessary part of the scheme to defraud.

112.     Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and  severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**COUNT II**
**VIOLATION OF EMPLOYEE RETIREMENT INCOME SECURITY ACT ("ERISA")**

113.     Plaintiff restates and re-alleges the above paragraphs as if fully set forth in this cause of action.

114.     Defendants provide employee benefit plans subject to ERISA, including Retirement Plans, 401(k), health care, dental, group life insurance, and coverage for long-term disability, all of which are available to Farm Bureau employees.

115.     By mislabeling its Insurance Agents as "independent contractors," Farm Bureau,

and related entities involved with the employee-benefit plans, have wrongfully and systematically excluded qualifying "employees," such as Plaintiff and the Class members, from accessing or receiving benefits under Farm Bureau's ERISA-protected plans

116.    Under 29 U.S.C. §1132 (a)(l)(B), Plaintiff and the class members are authorized to clarify and to enforce their rights to the ERISA-protected benefits that Farm Bureau provides to other properly classified employees.

117.    This Court has jurisdiction to hear this claim under 29 U.S.C. §1132(e)(1). In conformity with 29 U.S.C. §1132(h), Plaintiff is contemporaneously serving this Complaint, by certified mail, on the secretaries of Labor and Treasury.

118.    The class period for the claim extends six years back from the date this matter was filed with this Court.

119.    Defendants have improperly denied employee benefits to Plaintiff and class members based on Defendants' legally invalid contention that its insurance agents are independent contractors.  Defendants misclassification scheme stretches across multiple decades and makes it futile for any insurance agent to request full employee benefits from Farm Bureau or to appeal any subsequent denial of ERISA-protected benefits.

120.    Because Plaintiff and the class members, however, are in fact employees, they were and are entitled to employee benefits from Farm Bureau's various employee plans.

121.    Defendants' misclassification practices breached a fiduciary obligation, under 29 U.S.C. § 1104(a)(1)(D), owed to Plaintiff, Class members, and all other employees, by failing to administer the benefit plans in accordance with the defined terms and in compliance with all ERISA-imposed requirements.

122.    Defendants' misclassification scheme has damaged Plaintiff and Class Members,

29

including but not limited to loss of benefits due and owing from Farm Bureau's Retirement Plans, 401(k) matches and account growth over time, financial and health impairment from lack of access to superior healthcare benefits, savings from obtaining multiple types of insurance through discounted group-plan rates, and other resulting financial losses.

123.     Plaintiff and Class Members have suffered actual harm from Defendants' uniform misclassification practices.  The full extent of damages arising from Defendants' conduct will be proven at trial and ultimately decided by a jury.

124.     Plaintiff and the class members are therefore entitled, pursuant to 29 U.S.C. §1132 (a)(l)(B), to damages from improperly withheld employee benefit plans, declaratory relief, equitable restitution, injunctive relief, and full monetary restitution for all ERISA benefits to which Plaintiff and Class members are retroactively entitled under the relevant employee benefit plans to the full extent required to remedy all class harms and prevent Defendants' unjust enrichment. Plaintiff is further entitled to prejudgment interest, costs, and attorneys' fees pursuant to 29 U.S.C. §1132(g).

## COUNT III
## MISREPRESENTATION

125.     Plaintiff restates and re-allege the above paragraphs as if fully set forth in this cause of action.

126.     Plaintiff and Class Members were purportedly hired by Defendants to work as "independent contractors" who would own and run their very own business with full control over the manner and means for operating the business.

127.     But in fact, Defendants knew or should have known, at all times, that the "independent contractor" classification in the Agreements was improper and that Plaintiff and

Class Members were "employees" entitled to the benefits and protections of all laws enacted for employees.

128.    Plaintiff is informed, believes, and on that basis alleges, that Defendants intentionally misled Plaintiff and Class Members as to their employment status, or made such representations to Plaintiff and the Class Members recklessly and/or negligently, and deliberately concealed from and/or failed to disclose the excessive control exercised over Defendants' insurance agents and a multitude of after-the-fact rules, requirements, and regulations that were concealed from all written Agreements.

129.    At all material times, Defendants intended to and did induce Plaintiff and Class Members to reasonably and justifiably rely to their detriment on the false and fraudulent representations made to them by Defendants in published recruitment materials and Agency Agreements concerning the true nature of the employment relationship which effectively eliminated the false promise to provide autonomy over the means and manner of conducting business operations while still forcing Plaintiff and Class Members to bear the costs of running Defendants' business under Defendants' extensive control.

130.    Defendants' misrepresentations were intentional, reckless, willful, or wanton, and Defendants' fraudulent contact reflects a complete disregard for Plaintiff's and Class Members rights under applicable laws prohibiting such misrepresentations.

## COUNT IV
## UNJUST ENRICHMENT

131.    Plaintiff restates and re-alleges the above paragraphs as if fully set forth in this cause of action.

132.    Defendants' have been unjustly enriched by treating Plaintiff and Class Members

as employees, obtaining the benefits of an employment relationship, and unlawfully misclassifying Plaintiff and Class Members as independent contractors in order to escape Defendants' obligations to provide full employee benefits and meet other financial obligations.  Plaintiff has a common-law claim against Defendants' to remedy this unjust enrichment.

133.    The class period for this unjust enrichment claim extends six years back from the filing of this action.

134.    Plaintiff and the Class Members conferred a multitude of benefits on Defendants, the retention of which would be inequitable without payment. The benefits are those business expenses that Defendants required Plaintiffs and Class Members to pay, but would be Defendants' financial obligation to pay under a lawful or typical commercial employee-employer relationship. These expenses include but are not limited to:

    a.   Rent for office space;

    b.   Advertising;

    c.   Licensing;

    d.   Travel;

    e.   Technology and equipment;

    f.   Premiums for various types of commercial, workers' compensation, and other related insurance policies;

    g.   Office staff; and

    h.   Inferior healthcare insurance and retirement plans compared to those offered to Defendants' properly classified employees.

135.    Defendants have accepted and appreciated the value of shifting these expenses onto plaintiff and the class. Under these circumstances, it would be inequitable for defendant to

retain this benefit without payment to plaintiff and the class for the expenses.

## COUNT V
## DECLARATORY RELIEF

136.     Plaintiff restates and re-alleges the above paragraphs as if fully set forth in this cause of action.

137.     An actual controversy concerning legal rights exists between the parties regarding:

a. Whether Defendant unlawfully classified Plaintiff and Class Members as independent contractors and thereby wrongfully denied common employee benefits to Plaintiff and Class Members, such as:

    i.     holiday and vacation pay;

    ii.     paid sick leave;

    iii.     travel and operating payment or reimbursement for conducting business;

    iv.     workers' compensation insurance;

    v.     unemployment insurance;

    vi.     income tax withholding;

    vii.     contributions to Defendants' retirement plan(s);

    viii.     access to Defendants' employee benefit plans

b. Whether Defendant misrepresented the scope of its control, authority, and terms of the relationship with its insurance agents in Defendants' Solicitations and Agent Contracts.

c. What amounts Plaintiff and Class Members are entitled to receive in compensation, benefits, and operating expenses to be reimbursed by Defendants.

33

d. What amounts Plaintiff and Class Members are entitled to receive in interest on unpaid benefits, compensation, and other payments due and owing.

138.     Plaintiff and Class Members seek a declaratory judgment in their favor confirming their true status as legal employees of Defendants and right to all benefits provided to other properly classified employees of Defendant.

139.     Plaintiff and Class Members also seek entry of a declaratory judgment that Defendants' employee-classification practices, as alleged in this Complaint, are unlawful and therefore require Defendants to fully compensate Plaintiff and Class Members for all damages and losses described in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff individually, and on behalf of all other similarly situated, demands judgment against the Defendants and request the follow relief from this Court:

A.     An order certifying the Class as described with the named Plaintiff as Class Representative and appointing undersigned counsel as Lead Counsel for the Class;

B.     A declaration that Plaintiff and Class Members are legal "employees," for all material purposes, including, but not limited to, ERISA;

C.     A declaration that Plaintiff and Class Members are full participants in all ERISA plans otherwise available to Farm Bureau employees;

D.     An order that requires Farm Bureau to pay or otherwise compensate Plaintiff and Class Members for all ERISA benefits to which they are retroactively entitled;

E.     An order requiring Farm Bureau to reimburse and/or indemnify Plaintiffs and Class Members for the Farm Bureau business expenses incurred;

F.     An injunction barring Defendants from continuing to misclassify the Class as

34

"independent contractors" and to classify them as "employees";

G.    An award of reasonable attorneys' fees, plus the costs and expenses of this action;

H.    Pre- and post-judgment interest, as afforded by law;

I.    Actual damages and three times actual damages;

J.    All such other legal and equitable relief this Court deems proper for Plaintiffs and Class Members.


## PLAINTIFF'S DEMAND FOR JURY TRIAL

Plaintiff hereby requests and demands a trial by jury on all issues so triable.

## DESIGNATED PLACE OF TRIAL

For the place of trial, Plaintiff hereby designates the United States District Court for the District of Kansas at Kansas City, Kansas.

Respectfully submitted,


/s/ Rex A. Sharp
Rex A. Sharp, KS #12350
Ryan C. Hudson, KS #22986
REX A. SHARP, P.A.
5301 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 901-0419 Fax
rsharp@midwest-law.com
rhudson@midwest-law.com


Paul ("Pablo") Mose, KS # 27532
MOSE LAW LLC
3111 Strong Avenue
Kansas City, Kansas 66106
(913) 432-4484
(913) 432-4464
Pablo@moselaw.com

**ATTORNEYS FOR PLAINTIFFS**